TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00534-CR







Robert Lee Brown, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 00-2368, HONORABLE MIKE LYNCH, JUDGE PRESIDING





 Appellant Robert Lee Brown was indicted on one count of aggravated robbery. See
Tex. Penal Code Ann. § 29.03 (West 1994). The jury found Brown guilty of the offense, and the
trial court assessed the punishment at thirty-two years' imprisonment. On appeal, Brown raises one
issue: the trial court erred in denying his motion to suppress the in-court identification by the victim. 
We will affirm.

 

FACTUAL AND PROCEDURAL BACKGROUND

 On September 30, 1999, Brown, his girlfriend, Sonya Holder, and two other men
planned to rob Pete Arevalo, a sixty-year-old man who owned and operated Arevalo Truck and
Automotive. They wanted to steal money and crack cocaine from Arevalo because Brown's cousin
was incarcerated and needed money to get out of jail. Holder made her living as a prostitute and had
been meeting with Arevalo every week for the past four years to exchange sexual favors for money
and crack cocaine. Holder testified that she considered Arevalo a friend and that he had never hurt
her.

 Brown and the two other men decided to rob Arevalo because Holder said she knew
where he kept his money and drugs. Holder agreed to help them get into Arevalo's apartment. On
the night of September 30, Holder knocked on Arevalo's door. Arevalo got out of bed and only saw
Holder as he looked through the door's peephole. Holder told him that she needed to use the
restroom, and he let her into the apartment.

 Holder entered the apartment, and the three men followed her. One man said to
Arevalo, "We want to sell you a gun." A second man displayed a chrome pistol. Arevalo told the
men that he was not interested. Arevalo testified that the first man suddenly punched him and then
threw his arms around him. While the first man held Arevalo, the second man pistol-whipped him
several times. The second man then pointed the gun at Arevalo's face and asked where he kept his
money. Arevalo testified that he swung his body around in order to bring the first man between
himself and the second attacker. The two assailants responded by punching and pistol-whipping
Arevalo several times. Arevalo finally submitted and told the two men where his money was
located.

 Arevalo testified that he was suddenly able to free himself from the first man's grasp
and ran to his bedroom where he kept a 12-gauge pump shotgun. The bedroom was well lit, and
Arevalo said that he could see his assailants coming for him. Another struggle ensued between
Arevalo and the two men. Arevalo attempted to fire the shotgun twice, but it misfired each time. 
The second man assaulted Arevalo with the pistol several more times and took the shotgun from
him. The second man then gave the handgun to the first man, who also pistol-whipped Arevalo. The
third man yelled that they needed to leave, at which point all three men fled. Before leaving the
bedroom, however, the second man pointed the shotgun at Arevalo's stomach. Arevalo testified that
the second man attempted to fire the shotgun, but it misfired again. During the robbery, Holder
neither aided Arevalo nor participated in the assault.

 After the attackers left his apartment, Arevalo dialed 911. The emergency medical
services took Arevalo to Brackenridge Hospital for treatment. His injuries included eight lacerations
on his head, one deep laceration near his left eye, numerous abrasions on his torso, extensive
bruising on his arms, chest, and under his armpits, three chipped teeth, and one tooth severed at the
gum line. Arevalo described one assailant as a dark-skinned African-American male and the other
as a light-skinned African-American male about eighteen to twenty years old. He told the police that
the lighter skinned man was the one who initially pistol-whipped him, took the shotgun from him,
and attempted to shoot him. Arevalo later identified this man as Brown. The darker skinned man,
who was never identified, also pistol-whipped Arevalo during the struggle.

 Shortly after Arevalo made his statement, the police arrested Holder for her
involvement in the robbery. She identified the three men with her that night as Robert, Quincy, and
Sean. Holder knew Robert because they had been seeing each other for a few months and were
having sexual relations and smoking crack cocaine together. Although Holder did not know
Robert's last name, she thought he had a brother named Kevin Caldwell. With that information, the
police discovered Robert Brown, the half-brother of Kevin Caldwell. Holder positively identified
Brown when the police showed her a picture of him.

 The police made a photographic lineup containing Brown's photo, which they showed
to Arevalo. After Arevalo identified Brown, whom he had previously described as a light-skinned
black male, the police issued an arrest warrant for him. 

 Brown was charged by indictment on April 18, 2000, with the felony offense of
aggravated robbery with a deadly weapon, enhanced with five prior felony convictions in a single
enhancement paragraph. On May 1, 2000, Brown was arraigned and entered a plea of not guilty. 
On May 5, 2000, the jury found Brown guilty of the offense of aggravated robbery. Brown elected
to have the trial court assess his punishment, and it imposed a prison sentence of thirty-two years.

 Brown is a dark-skinned African-American male. He complains that because his
picture in the photographic lineup was overexposed, his skin appeared unusually light in complexion. 
Brown believes that this identification procedure was suggestive and resulted in mistaken
identification. Furthermore, he contends that he was chosen by Arevalo because he had the lightest
complexion among the other pictures in the lineup. He asserts one point of error: the trial court
erred in denying the motion to suppress the in-court identification by the victim. 


STANDARD OF REVIEW

 The court of criminal appeals has set forth the standard of review for trial court
rulings on motions to suppress evidence based upon Fourth Amendment claims. See Guzman v.
State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford almost total deference to a trial court's
determination of the facts, especially when the trial court's findings are based on an evaluation of
credibility and demeanor. Id. We give the same amount of deference to mixed questions of law and
fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor. 
Id. If mixed questions of law and fact do not relate to credibility and demeanor, then we review such
determinations de novo. Id.

 The standard of review for a ruling on a motion to suppress an in-court identification
due to an impermissibly suggestive pretrial identification procedure is the Guzman standard. Loserth
v. State, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998); Guzman, 955 S.W.2d at 88-89. Whether a
photographic identification procedure was so impermissibly suggestive as to give rise to a very
substantial likelihood of misidentification is a mixed question of law and fact that does not turn on
an evaluation of credibility and demeanor. Loserth, 963 S.W.2d at 772-73. Accordingly, we will
apply a de novo standard.

DISCUSSION

Burden of Proof

 A pretrial identification procedure may be so suggestive and conducive to mistaken
identification that subsequent use of that identification at trial would deny the accused due process
of law. Webb v. State, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988). Determining the admissibility
of an in-court identification involves a two-step analysis: (1) whether the out-of-court identification
procedure was impermissibly suggestive, and (2) whether that suggestive procedure gave rise to a
very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377,
384 (1968); Barley v. State, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995); Delk v. State, 855 S.W.2d
700, 706 (Tex. Crim. App. 1993); Cantu v. State, 738 S.W.2d 249, 251 (Tex. Crim. App. 1987). 
Each case must be considered on its own facts. Simmons, 390 U.S. at 384. Furthermore, the analysis
requires an examination of the totality of the circumstances surrounding the identification. Id.

 The defendant must prove the two elements by clear and convincing evidence. 
Barley, 906 S.W.2d at 33-34; Delk, 855 S.W.2d at 706; Herrera v. State, 682 S.W.2d 313, 318 (Tex.
Crim. App. 1984). If the defendant meets this burden, then the in-court identification is inadmissible
unless the State can prove by clear and convincing evidence that the identification was of
"independent origin." United States v. Wade, 388 U.S. 218, 240 (1967); Williams v. State, 477
S.W.2d 885, 889 (Tex. Crim. App. 1972).

 When determining the admissibility of identification testimony, reliability is the crux
of the matter. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Loserth, 963 S.W.2d at 772. 
Testimony is reliable if the totality of the circumstances reveals no substantial likelihood of
misidentification despite a suggestive pretrial procedure. Simmons, 390 U.S. at 383. In Neil v.
Biggers, 409 U.S. 188 (1972), the United States Supreme Court enumerated five nonexclusive
factors used to assess reliability. They are: (1) the opportunity of the witness to view the criminal
at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior
description of the criminal; (4) the level of certainty demonstrated by the witness at the
confrontation; and (5) the length of time between the crime and the confrontation. Id. at 199-200. 
We view these five factors in the light most favorable to the trial court's ruling. Ibarra v. State, 11
S.W.3d 189, 195-96 (Tex. Crim. App. 1999). The five factors, viewed in this manner, are then
reviewed de novo against "the corrupting effect" of the suggestive pretrial identification procedure. 
Id.; Loserth, 963 S.W.2d at 773-74.


Impermissibly Suggestive Procedure

 Every photographic lineup procedure creates the possibility of misidentification, and
a police officer who improperly employs photographic lineups increases the possibility that a witness
may err in identifying a perpetrator. A witness may have obtained only a brief glimpse of the
criminal or may have seen him under poor lighting conditions. Simmons, 390 U.S. at 383. Such a
witness may find it difficult to identify the criminal, and improper photographic identification
procedures heighten this difficulty, creating a greater margin of error. If a misidentification occurs,
the witness thereafter is apt to retain in his memory the image of the photograph rather than of the
person actually seen. Id. 

 However problematic photographic lineups may be, they remain useful. Every
photographic lineup must contain individuals who fit the rough description of the suspect; however,
it is not essential that all individuals be identical. Herrera, 682 S.W.2d at 319; Dickson v. State, 492
S.W.2d 267, 271 (Tex. Crim. App. 1973) (stating that "neither due process of law nor common
sense" requires such exactitude). To argue the contrary would imply that lineups constitute per se
violations of due process. See Biggers, 409 U.S. at 198; Clemons v. United States, 408 F.2d 1230,
1251 (D.C. Cir. 1968). 

 There are numerous examples of what does and does not constitute impermissible
suggestiveness. For example, a lineup that consists of five persons, two of whom have beards and
who are not physically close to the defendant in size and hair color, is not impermissibly suggestive. 
Turner v. State, 600 S.W.2d 927, 932 (Tex. Crim. App. 1980). The same holds true even if a
defendant appears older than the other persons in the lineup. Williams v. State, 675 S.W.2d 754, 757
(Tex. Crim. App. 1984). On the other hand, a lineup will be impermissibly suggestive if the
defendant was the only white male in the spread and the other pictures were of Mexican-American
males. Tapley v. State, 673 S.W.2d 284, 286 (Tex. App.--San Antonio 1984, pet. ref'd). 
Suggestiveness may also be created by the manner in which the pretrial identification procedure is
conducted, such as police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array. Rogers v. State, 774 S.W.2d 247, 260 (Tex. Crim. App. 1989). Finally, the use
of a lone photograph, without any of the traditional safeguards of a lineup, is inherently suspect. 
Loserth v. State, 985 S.W.2d 536, 543 (Tex. App.--San Antonio 1998, pet. ref'd) (op. on remand).

 In the case at bar, we must consider whether the photograph of Brown used in the
lineup, which he complains was overexposed, is impermissibly suggestive in that it is easily
distinguishable from the other photographs in the lineup. Brown further asserts that the investigating
officer used an overexposed photograph in the lineup to coincide with the description of Brown
given by Arevalo as a "light-skinned black male."

 While in every instance, the trial court's assessment of the suggestive nature of the
actual photographic lineup used by the police will be purely subjective, the remark of the trial judge
here is worth noting:

 I'm looking at [the defendant in photo number two] very carefully here, and I don't
see how it stands out. [It's] obvious that some light is hitting two, three, five, and six
on the forehead, and to a lesser degree one, and one looks darker than two, and three
looks a little tanner. . .[but] two and five are close. One and six are close. I don't see
how two particularly stands out.


This comment is an accurate description of the lineup. Brown's picture, though overexposed, is
virtually indistinguishable from the others used in the array. Six men were depicted in the lineup. 
Each individual in the lineup is a young African-American male with short hair. The men all have
comparable facial features. The clothing worn is similar, apparently jail uniforms, and all of the
photographs have similar backgrounds. Finally, light is striking the faces of most of the men, giving
them an appearance of overexposure. Furthermore, the record shows that the police officers never
told Arevalo that a suspect was included in the photographic line-up; Arevalo identified Brown
independently. Thus, we conclude that the photographic array was not impermissibly suggestive.


Likelihood of Irreparable Misidentification

 However, assuming for the sake of argument that the photographic lineup was
impermissibly suggestive, we will next determine whether that fact creates a very substantial
likelihood of irreparable misidentification. In conducting this analysis, we look to the five Biggers
factors for guidance. See Biggers, 409 U.S. at 199-200. The court of criminal appeals has held that
we are to treat the Biggers factors as issues of fact and review them in a light most favorable to the
trial court's ruling. Loserth, 963 S.W.2d at 773. If sufficient indicia of reliability are present, then
the courtroom identification is admissible. Barley v. State, 906 S.W.2d 27, 34 (Tex. Crim. App.
1995). It is Brown's burden to prove by clear and convincing evidence that the identification has
been irreparably tainted. Id.

 First, we must ask whether Arevalo had an adequate opportunity to view the offenders
at the time of the crime. Arevalo testified that the struggle with his assailants lasted for several
minutes. A significant portion of this struggle occurred in Arevalo's bedroom, which was well lit. 
Arevalo testified that he saw Brown's face during the ordeal and particularly focused on it while in
the bedroom. Brown's face was neither covered by a mask nor distorted by poor lighting conditions. 

 We must also consider Arevalo's degree of attention. Although Arevalo was sleeping
when Holder arrived at his residence, he possessed enough attentiveness to recognize Holder. 
During the struggle, Arevalo stood face-to-face with his assailants and tried to defend himself
repeatedly. Arevalo testified that Brown's face was one he would never forget. Witnesses who are
victims, rather than casual observers, are generally believed to have a greater degree of attention. 
See Manson, 432 U.S. at 115; Barley, 906 S.W.2d at 35; Loserth, 985 S.W.2d at 544.

 Next, we examine the accuracy of Arevalo's prior description of Brown. Arevalo
described his assailants in terms of their skin tone. One assailant was a "light-skinned black male
about eighteen to twenty years old" and the other was a "dark-skinned black male." We
acknowledge that these descriptions are very general and could match the profiles of most African-American men.

 The fourth Biggers factor concerns the level of certainty demonstrated by the witness
at the confrontation. When the police presented Arevalo with the photographic lineup, he promptly
identified Brown as one of the assailants. Arevalo never wavered in his certainty and consistently
identified Brown both inside and outside of court.

 Finally, we must assess the length of time between the crime and the confrontation. 
The aggravated robbery occurred on September 30, 1999, and Arevalo's in-court confrontation with
Brown occurred on May 2, 2000. This period of eight months had no detrimental effect on the
accuracy or consistency of Arevalo's identification. Such a period of time will not destroy reliability
when a witness's recollections are consistent. See Barley, 906 S.W.2d at 35; see also Delk, 855
S.W.2d at 707. We conclude that the facts of this case, viewed in the light most favorable to the trial
court's ruling, sufficiently satisfy each of the Biggers factors, except the accuracy of Arevalo's prior
description.


Corrupting Effect of the Pretrial Identification Procedure

 Having reviewed the Biggers factors, we now weigh those factors against the
corrupting effect of the pretrial identification procedure. See Loserth, 963 S.W.2d at 774. The
inquiry above reveals only one factor for us to consider: the accuracy of Arevalo's prior description. 
 A witness who gives a vague prior description does not make an identification
procedure impermissibly suggestive. Rather, an impermissibly suggestive identification procedure
could produce irreparable misidentification because the witness might be coaxed into identifying
someone based on vague characteristics. An excellent analysis of this problem appears in the court
of appeal's opinion on remand in Loserth. See Loserth, 985 S.W.2d at 536. In that case, a young
woman was brutally murdered by an intruder in her apartment. Id. at 538. Around 3:40 a.m., Lewis
Devlin, a neighbor who lived in the adjacent apartment building, heard a scream and called the
police. Id. Shortly thereafter, he attempted to locate the origin of the scream by staring out of his
window. Id. Devlin noticed that the victim's apartment was lit. Id. He saw a tall, thin person walk
onto the victim's balcony and then leap off of it. Id. Devlin observed these events from a distance
of eighty-eight feet. Id. In Loserth, Devlin described the criminal as "a tall, thin person, wearing
dark clothes." Id. at 544. A month later, the witness underwent hypnosis and identified the criminal
as a man. Id. at 545. These descriptions never specified the ethnicity of the criminal. Id. at 546. 
However, when Devlin was shown a single photograph of the suspect, he maintained with certitude
that this was the criminal. Id. at 547. The court of appeals held that this suggestive procedure had
a corrupting effect on the witness. Id. at 547.

 The case at bar is distinguishable from Loserth. First, Arevalo made physical contact
with the assailants in a lighted room for a period of several minutes. During the struggle, Arevalo
stared into his attackers' faces. Devlin, by contrast, saw the criminal in the dark from eighty-eight
feet away while in his own apartment. Id. at 538. Second, Arevalo specified the gender,
approximate age, ethnicity, and skin tone of his assailants. Although "light-skinned black male
about eighteen to twenty years old" is a general description, it is far more specific than Devlin's
observation, which could include either gender and any racial group. Third, Arevalo picked Brown
out of a photographic lineup; Devlin, by contrast, was shown only a single picture. Id. at 539-40. 
Fourth, and most importantly, Arevalo consistently identified Brown as one of his assailants. In
Loserth, Devlin made the dramatic change from virtually no memory to complete certitude. Id. at
547. Weighing the Biggers factors against the corrupting effect of the hypothetically suggestive
pretrial identification, we conclude that no substantial risk of irreparable misidentification was
created and that the in-court identification was admissible. Accordingly, Brown's single point of
error is overruled.





CONCLUSION

 Having concluded that the trial court did not err in denying Brown's motion to
suppress the in-court identification by the victim, we affirm the trial court's judgment.



 _____________________________________________

 David Puryear, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: July 26, 2001

Publish