COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-152-CR
 
 
MAURO 
CASTANEDA PALACIO                                              APPELLANT
 
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
I. Introduction
        A 
jury convicted Appellant Mauro Castaneda Palacio of criminal solicitation of a 
minor and assessed punishment at ten years’ confinement.  In two points, 
Palacio complains that the evidence corroborating the minor solicitee’s 
testimony is insufficient and that the trial court abused its discretion by 
admitting an in-court identification tainted by an impermissibly suggestive 
photo lineup.  We will affirm.
II. Factual 
Background
        W.K., 
the solicitee, is a female minor who resides in Bowie.  In September 2002, 
while using a computer at her grandmother’s home, W.K. and a friend entered an 
internet chat room, “Yahoo! Teen Shoutouts,” for the first time.[2]  While in the chat room, she and her friend were 
contacted by an individual whose screen name identified him as 
“killerguy26.”  During the conversation, “killerguy26" asked 
what W.K. and her friend looked like, where they lived, what they thought about 
their school, and other general questions.  The chat room conversation 
lasted for thirty minutes, and after it concluded, W.K. did not enter the chat 
room again until January 2003, when she accessed the internet from a computer at 
her home.
        Logging 
onto the internet for the first time at her residence, W.K. created a screen 
name, “crazywhitney07,” and returned to the “Teen Shoutouts” chat room 
provided by Yahoo!.  W.K. saw that “killerguy26" was also in the 
chat room, and a conversation ensued. W.K. was under the impression that she was 
speaking with another teenager because “killerguy26" “was acting like a 
kid or like a teenager” and because he said that he was sixteen years old.  
W.K. expressly informed “killerguy26" that (at the time) she was fourteen 
years old.
        W.K. 
once again entered the same chat room in February 2003 and was contacted by an 
individual using the screen name “mauro76543.”  W.K. was not positive, 
but she thought that “mauro76543" was the same individual as 
“killerguy26” because similar questions were asked and similar conversations 
took place.  “Mauro76543" later contacted W.K. using the name 
“palacil@prodigy.net.”[3]
        W.K. 
chatted with "palacil@prodigy.net" about ten times during the months 
of February and March 2003.  On March 20, 2003, “palacil@prodigy.net” 
made sexual advancements towards W.K. and expressed his desire to meet her in 
order to carry out these sexual advancements.[4]  
W.K. told “palacil@prodigy.net” where she lived, and the individual 
recommended meeting at Pelham Park in Bowie on March 24, 2003.  The 
individual further stated that he would be driving a green Jeep Liberty.
        On 
March 24, 2003, W.K. passed Pelham Park while riding home on the school bus, but 
she did not notice a green Jeep Liberty.  Later that same day, however, W.K. 
and her nine year-old sister, K.K., were outside of their house writing on the 
sidewalk with chalk when W.K. noticed a green Jeep Liberty coming around the 
corner.  Scared, W.K. grabbed K.K. and ran into their house.  The Jeep 
circled the block three times and eventually pulled into the driveway of 
W.K.’s house.  The individual, later identified by K.K. as Palacio, 
exited the Jeep, approached the front door, and knocked.  W.K. instructed 
K.K. to tell Palacio that she was not there if he asked for her.  K.K. 
answered the door, and Palacio asked for W.K.  K.K. responded that W.K was 
not there, Palacio said that he would be back, and then he left.[5]  K.K. informed her and W.K.’s grandmother of what 
had happened, and W.K.’s grandmother reported the incident to the police.
        On 
March 25, 2003, W.K., with her mother by her side, had a conversation with 
“palacil@prodigy.net” in a chat room.  The conversation appeared to 
refer to the events that took place on March 24, 2003.  W.K. printed and 
retained a copy of this chat room conversation.
        The 
Bowie Police Department contacted the Texas Attorney General’s Office and 
requested assistance with the matter.  Randy Watkins, a sergeant 
investigator with the Attorney General’s office, conducted the investigation.  
Investigator Watkins sent grand jury subpoenas to Yahoo!, SBC Internet Services, 
and Level 3 Communications in order to obtain the personal information of the 
individual, or individuals, using the screen names “mauro76543" and 
“palacil@prodigy.net.“  The records requested from Yahoo! indicated 
that “mauro76543" was Mr. Mauro Palacio, resident of 2913 Kim Drive, 
Killeen, Texas, 76543.  The subscriber information further showed that 
“mauro76543" had a registration IP address of 63.254.163.195 and a login 
IP address of 64.196.223.38.[6]  The records 
requested from SBC Internet Services indicated that the subscriber was Mauro 
Palacio, resident of 2913 Kim Drive, Killeen, Texas, 76543.  Records 
received from Level 3 Communications indicated that the user’s IP address was 
64.196.223.38 and that the customer identification was “palacil@prodigy.net.”   
They further showed beginning and ending session times.  Based on the 
information gathered, Investigator Watkins determined that Palacio was 
“mauro76543" and “palacil@prodigy.net.”
        Palacio 
was subsequently arrested and charged with criminal solicitation of a minor.  
Authorities also seized three computers from Palacio’s residence.  An 
examination of the contents of the computers revealed a profile of 
“crazywhitney07" and a map to 1314 Eldorado Street in Bowie, Texas, 
W.K.’s residence.
III. Criminal Solicitation of a Minor
        In 
his first point, Palacio argues that W.K.’s testimony was not strongly 
corroborated as to the solicitation itself and as to Palacio’s intent that W.K. 
actually act upon the solicitation as required under the penal code.  The 
State contends that it introduced evidence—exhibits and testimony—strongly 
corroborating W.K.’s testimony of both the solicitation and Palacio’s intent 
that W.K. act on the solicitation.
        A. Corroboration Requirement
        The 
offense of criminal solicitation of a minor contains a corroboration 
requirement.  See Tex. Penal 
Code Ann. § 15.031(c) (Vernon 2003).  It states, “A person may 
not be convicted under this section on the uncorroborated testimony of the minor 
allegedly solicited unless the solicitation is made under circumstances strongly 
corroborative of both the solicitation itself and the actor’s intent that the 
minor act on the solicitation.”  Id.  General criminal 
solicitation contains an almost identical corroboration requirement.[7]  See id. § 15.03(b).  The corroboration 
requirement for general criminal solicitation is analogous to the corroboration 
requirement found in the accomplice witness statute.  See Tex. Code Crim. Proc. Ann. art. 38.14 
(Vernon Supp. 1979); Richardson v. State, 700 S.W.2d 591, 594 (Tex. Crim. 
App. 1985).  Therefore, the same test for evaluating the sufficiency of the 
corroboration is used.  See Richardson, 700 S.W.2d at 594; Ganesan 
v. State, 45 S.W.3d 197, 201 (Tex. App.—Austin 2001, pet. ref’d).  
Accordingly, because the corroboration requirement in 15.031(c) is virtually 
identical to the corroboration requirement in 15.03(b), we will employ the same 
rules used when performing a corroboration examination under the accomplice 
witness statute.  See Bolton v. State, No. 03-99-00539-CR, 2000 WL 
852801, at *2-3 (Tex. App.—Austin June 29, 2000, no pet.) (not designated for 
publication).
        When 
performing a corroboration examination under the accomplice witness statute, 
“[t]he test used to evaluate such corroboration is to eliminate from 
consideration the accomplice testimony and then determine whether there is other 
incriminating evidence tending to connect the defendant with the crime.”  
Richardson, 700 S.W.2d at 594.  The corroboration evidence need not 
directly link the defendant with the crime or be sufficient in itself to 
establish guilt.  Id.  Moreover, “the court should consider 
the combined weight of the non-accomplice evidence even if it is entirely 
circumstantial.”  Id.
 
B. The Testimony of W.K., the Minor Solicitee, Was Strongly Corroborated as to 
the Solicitation Itself and Palacio’s Intent That W.K. Act on the 
Solicitation.
 
        In 
the present case, we eliminate W.K.’s testimony and examine the remaining 
evidence to determine whether it connects Palacio to the solicitation.  See 
id.  Investigator Watkins sent grand jury subpoenas to Yahoo!, SBC 
Internet Services, and Level 3 Communications and learned that Palacio used the 
screen names “killerguy26," “mauro76543," and “palacil@prodigy.net.”  
The subpoenaed information further showed that “palacil@prodigy.net” resides 
in Killeen and logged in under this account/screen name on March 21, 23, and 25, 
at the same times W.K. testified the solicitation by and communications with 
Palacio occurred.  Additionally, Palacio’s computer contained a profile 
for W.K. and a map to W.K.’s house.  As the State points out, “a link 
was established between the victim and [Palacio].”
        K.K. 
identified Palacio as the person who knocked on her front door and asked for W.K.
        The 
transcript of the chat room conversation that occurred between Palacio (“palacil@prodigy.net”) 
W.K. (“crazywhitney07”), and W.K.’s mother after the attempted March 24, 
2003 meeting also corroborates the solicitation and Palacio’s intent that W.K. 
act on the solicitation.  The conversation evidences and confirms not only 
the unique and personal relationship between the two, but the March 24, 2003 
events.  Portions of the transcript read as follows:
 
        palacil@prodigy.net: hi
        crazywhitney07: 
hi
        crazywhitney07: 
whats up
        palacil@prodigy.net: not much but y u wana talk to me?
        crazywhitney07: 
i dont know
        crazywhitney07: 
i cant just talk?
        palacil@prodigy.net: 
no
        palacil@prodigy.net: 
because u lire to me
        crazywhitney07:
        palacil@prodigy.net: 
lie
        crazywhitney07: 
why?
        palacil@prodigy.net: 
i dont see u yesterday
        
crazywhitney07: i wasnt at home i told u that i went to a friends house after 
school
        palacil@prodigy.net: 
u told me u see me out side
        palacil@prodigy.net: 
and take my plates
        crazywhitney07: 
i dont know what ur talking about but i lied
        palacil@prodigy.net: 
ok
        palacil@prodigy.net: 
ur sister look cut
        crazywhitney07: 
what does that mean
        palacil@prodigy.net: 
i only saying that
        palacil@prodigy.net: 
so probably u are more sexy
        crazywhitney07: 
u think shes pretty in another words?
        palacil@prodigy.net: 
yes
 
                . 
. . .
 
        palacil@prodigy.net: 
iso when i gona see u
        crazywhitney07: 
never
        palacil@prodigy.net: 
ok
        palacil@prodigy.net: 
bye
        crazywhitney07: 
y
        palacil@prodigy.net: 
i say bye
        crazywhitney07: 
y r u leaving
        palacil@prodigy.net: 
bye
        palacil@prodigy.net: 
i am looking girl
        palacil@prodigy.net: 
dont waste my time

                . 
. . .

        palacil@prodigy.net: 
ok why in the beginig u dont show up
crazywhitney07: because i was excited about going to my 
friends house and i didn’t know u would be there
        palacil@prodigy.net: 
we TALK A NITE BEFORE
        palacil@prodigy.net: 
u never do a date
        palacil@prodigy.net: 
and then dont show up
        crazywhitney07: 
i know i forgot im very sorry
        crazywhitney07: 
i want to c u
        palacil@prodigy.net: 
a 420miles and 7 1/2 hours?
        crazywhitney07: 
were do u live?
        palacil@prodigy.net: 
i not saying
        crazywhitney07: 
why
        palacil@prodigy.net: 
because u take my plates

                . 
. . .

        crazywhitney07: 
i want to meet u bad
        palacil@prodigy.net: 
why?
        palacil@prodigy.net: 
to give me up to the police
        crazywhitney07: 
it wont be a waste of time this time i promise
        palacil@prodigy.net: 
sure
        crazywhitney07: 
i will be there and only me
        crazywhitney07: 
nobody knows about u but my sister and i
        crazywhitney07: 
i told her not to tell
        palacil@prodigy.net: 
what about the other girl
        crazywhitney07: 
what othere girl?
        palacil@prodigy.net: 
she was playing basket ball
        crazywhitney07: 
that was my neibor she knows nothing we told her u were looking 4 someone and u 
got the rong house
        palacil@prodigy.net: 
so u was in the house

                . 
. . .

        palacil@prodigy.net: 
are u whitney father
        palacil@prodigy.net: 
or mother
        crazywhitney07: 
no im myself they go to bed at 9:00
        crazywhitney07: 
if they knew i was talking to u i would be dead
        palacil@prodigy.net: 
ok
        palacil@prodigy.net: 
so i do ur sister like me?
        crazywhitney07: 
no she didnt see u the sun was in her eyes
        palacil@prodigy.net: 
she see me like 3 times
        crazywhitney07: 
i can prove its whitney u have a green liberty jeep??rite
        palacil@prodigy.net: 
yes
 
Palacio’s comments in the above transcription 
corroborate the fact that he attempted to meet with W.K. after the solicitation, 
that he saw W.K.’s sister, K.K., and that his intentions were to meet W.K., 
not just communicate in a chat room.  Palacio also acknowledged the fact 
that he owned a green Jeep Liberty, the same type vehicle that pulled into 
W.K.’s driveway.
        Thus, 
Investigator Watkins’s testimony, K.K’s testimony, and the transcript of the 
conversation between Palacio and W.K. constitutes sufficient incriminating 
evidence to connect Palacio to the solicitation of W.K.  See Richardson, 
700 S.W.2d at 594.  Accordingly, we hold that the testimony of W.K. was 
strongly corroborated as to the solicitation itself and Palacio’s intent that 
W.K. actually act upon the solicitation. See Tex. Penal Code Ann. § 15.031(c).  
We overrule Palacio’s first point.
IV. Admissibility of In-Court Identification
        In 
his second point, Palacio argues that the trial court abused its discretion by 
admitting K.K.’s in-court identification of him.  Palacio argues that 
K.K.’s in-court identification was tainted by an impermissibly suggestive 
pretrial photographic lineup.  Palacio filed a pre-trial motion to suppress 
K.K.’s photographic identification on the ground that the photographic lineup 
was impermissibly suggestive.  After a hearing, the trial court denied 
Palacio’s motion to suppress.
        A. Standard of Review
        The 
standard of review by which appellate courts review a trial court’s ruling on 
a motion to suppress, as set forth in Guzman v. State, 955 S.W.2d 85 
(Tex. Crim. App. 1997), is applicable to review of a trial court’s ruling on a 
motion to suppress evidence based upon a claim that an in-court identification 
should not have been admitted due to taint by an impermissibly suggestive 
pretrial identification procedure.  See Loserth v. State, 963 S.W.2d 
770, 771 (Tex. Crim. App. 1998).  An appellate court gives almost total 
deference to the trial court’s ruling on mixed questions of law and fact that 
turn on an evaluation of the credibility and demeanor of the witnesses.  See 
id. at 772.  We review de novo mixed questions of law and fact 
that do not turn on an evaluation of credibility and demeanor. Id. When a 
trial court does not make express findings of historical facts, as is the case 
here, the facts are viewed in a light favorable to the trial court’s ruling.  
See id. at 774.  In the present case, the question of whether an 
identification procedure was so impermissibly suggestive as to give rise to a 
substantial likelihood of misidentification is a mixed question of law and fact 
that does not turn on an evaluation of credibility and demeanor.  See id. 
at 772-73; Cienfuegos v. State, 113 S.W.3d 481, 491 (Tex. App.—Houston 
[1st Dist.] 2003, pet. ref’d).  We therefore apply a de novo 
standard of review.
        B. The Pretrial Photographic Lineup Was Not 
Impermissibly Suggestive
        A 
pretrial identification procedure may be so suggestive and conducive to mistaken 
identification that subsequent use of that identification at trial would deny 
the accused due process of law.  Simmons v. United States, 390 U.S. 
377, 384, 88 S. Ct. 967, 971 (1968); Barley v. State, 906 S.W.2d 27, 
32-33 (Tex. Crim. App. 1995).  We apply a two-step analysis in order to 
determine the admissibility of an in-court identification:  (1) whether the 
pretrial identification procedure was impermissibly suggestive and, if so, (2) 
whether the suggestive procedure gave rise to a very substantial likelihood of 
irreparable misidentification.  Barley, 906 S.W.2d at 33.  If 
the pretrial identification was impermissibly suggestive, the court will then 
consider the five factors enumerated in Neil v. Biggers to determine 
whether the impermissibly suggestive procedure gave rise to a substantial 
likelihood of irreparable misidentification.[8]  
409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972). The analysis requires an 
examination of the totality of the circumstances surrounding the identification 
to determine if the procedure was unnecessarily suggestive.  Barley, 
906 S.W.2d at 33; Webb v. State, 760 S.W.2d 263, 269 (Tex. Crim. App. 
1988).  Moreover, the defendant bears the burden of establishing by clear 
and convincing evidence that the pretrial identification procedure was 
impermissibly suggestive.  Barley, 906 S.W.2d at 34.
        Every 
photographic spread must contain individuals who fit the rough description of 
the suspect.  See Burkett v. State, 127 S.W.3d 83, 87 (Tex. 
App.—Houston [1st Dist.] 2003, no pet.).  It is not essential, however, 
that all of the individuals be identical.  See id.; Brown v. 
State, 64 S.W.3d 94, 100 (Tex. App.—Austin 2001, no pet.).  
“[N]either due process nor common sense requires such exactitude.”  Buxton 
v. State, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985); Dickson v. State, 
492 S.W.2d 267, 271 (Tex. Crim. App. 1973).  The similarities in appearance 
of those individuals in the photographic spread should provide a reasonable test 
for the witness’s capacity to reliably identify the perpetrator.  See 
Ford v. State, 794 S.W.2d 863, 866 (Tex. App.—El Paso 1990, pet. ref’d).  
Furthermore, a spread is not impermissibly suggestive merely because each 
photograph can be distinguished in some manner from the defendant.  See 
Mungia v. State, 911 S.W.2d 164, 168 (Tex. App.—Corpus Christi 1995, no 
pet.).  Suggestiveness may also be created by the manner in which the 
pretrial identification procedure is conducted.  Barley, 906 S.W.2d 
at 33; Page v. State, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st 
Dist.] 2003, pet. ref’d).  Examples of this include police pointing out 
the suspect or suggesting that a suspect is included in the photo spread.  Page, 
125 S.W.3d at 647.
        Palacio 
argues that the pretrial photographic lineup was impermissibly suggestive 
because Palacio was the only Hispanic, the photographs were black and white 
photocopies of photographs, and the other individuals were not the same age as 
Palacio.
        Lieutenant 
Wallace of the Bowie Police Department was the only witness to testify during 
the hearing on Palacio’s motion to suppress the photographic identification. 
Lieutenant Wallace testified that the identification took place at K.K.’s 
residence and that he, another police officer, and K.K.’s parents were 
present.  W.K. and K.K. were separately shown the photos. K.K. identified 
Palacio after examining the photo array for about twenty seconds; W.K. was 
unable to identify Palacio. Lieutenant Wallace testified that the five 
photographs selected, in addition to Palacio’s photograph, were chosen because 
the men, like Palacio, had short hair and were similar to Palacio in size and 
build.  Lieutenant Wallace further testified, “We tried to pick the 
photos . . . that we had . . . on hand that most closely matched.”  He 
further testified that they all appeared to have the same complexion.
        After 
examining the photo spread, we conclude that the pretrial identification was not 
impermissibly suggestive.  See Barley, 906 S.W.2d at 33.  All 
of the individuals in the spread appear to be of similar age, size, and 
complexion.  See Burkett, 127 S.W.2d at 87.  They all have 
short-style haircuts, and none of them have noticeable facial hair.  
Because the photographs used were black-and-white copies of photographs, there 
is at least one other individual who appears to be Hispanic.  See also 
Zarychta v. State, 44 S.W.3d 155, 170 (Tex. App.—Houston [14th Dist.] 
2001, pet. ref’d) (holding photo array consisting of one male Caucasian and 
five male Hispanics not impermissibly suggestive where appellant was the male 
Caucasian).  Nonetheless, K.K. had an opportunity to view Palacio when she 
spoke to him at the front door of her house.  She identified him on the 
photo spread by writing, “The guy at my ho[u]se” next to his picture.  
Moreover, there is nothing in the record to demonstrate that the pretrial 
identification was impermissibly suggestive because of the manner in which the 
procedure was conducted.[9]  Barley, 906 
S.W.2d at 33.  All of the photos need not be identical, and the spread is 
not impermissibly suggestive merely because the other photos can be 
distinguished from Palacio’s photograph in some manner.  See Mungia, 
911 S.W.2d at 168.
        Thus, 
we hold that Palacio did not establish by clear and convincing evidence that the 
photo spread was impermissibly suggestive.  See Barley, 906 S.W.2d 
at 33-34.  As such, we do not reach the issue of whether the procedure gave 
rise to a substantial likelihood of irreparable misidentification.  See 
id. at 33.  Accordingly, the trial court did not abuse its discretion 
when it admitted K.K.’s in-court identification of Palacio.  We overrule 
Palacio’s second point.
V. Conclusion
        Having 
overruled both of Palacio’s points, we affirm the trial court’s judgment.
 
 
                                                                  SUE 
WALKER
                                                                  JUSTICE
 
 
PANEL A:   CAYCE, C.J.; 
HOLMAN and WALKER, JJ.
 
DO NOT PUBLISH
Tex. R. App. P. 
47.2(b)
 
DELIVERED: January 20, 2005

 
NOTES
1.  See Tex. R. 
App. P. 47.4.
2.  Palacio explains “chat rooms” in his brief:
“Chat rooms” differ from other forms of internet 
communication, such as e-mail, in that “chat rooms” provide a group of 
individuals the ability to communicate instantaneously with others in a “chat 
room” group.  The group participants enjoy interaction on a more-or-less 
conversational basis.  Each individual in the “chat room” communicates 
by typing their input (usually using an abbreviated-language form) into the 
computer.  The participant’s computer screen then reveals a running 
record of each participant’s input in the group’s ongoing conversation.  
“Chat room” participants are identified only by their screen name.
In order to gain access to chat rooms such as those 
provided by Yahoo!, one must first create a profile, then select a screen name, 
and then enter one of many various chat rooms through which communication with 
others is possible.  After entering a chat room, the user’s screen name 
will typically be listed on the right-hand side of the screen along with the 
other individuals who are in that particular chat room.  A user may then 
communicate with all of those present in the chat room or select a particular 
screen name listed and communicate privately with that individual.
3.  W.K. testified that she knew “mauro76543" and 
“palacil@prodigy.net” were the same individual because 
“palacil@prodigy.net” told her so.
4.  W.K. testified that “palacil@prodigy.net” “said that 
he wanted to have sex with me and finger me.”  She further testified that 
“[h]e said that he wanted me to give him a blow job.”  Evidence was 
also presented that “palacil@prodigy.net” desired to “rub [W.K.’s] 
body” and “squeeze [W.K.’s] breasts.”
5.  W.K. testified that she thought she saw the same green 
Jeep Liberty drive by her school sometime shortly after this encounter.
6.  “IP” stands for “Internet Protocal.”
7.  The legislature substituted the word “minor” for 
“person” in section 15.031(c).  See Tex. Penal Code Ann. § 15.031(c).
8.  These factors include: (1) the opportunity of the witness 
to view the criminal at the time of the crime, (2) the witness’s degree of 
attention, (3) the accuracy of the witness’s prior description of the 
criminal, (4) the level of certainty demonstrated by the witness at the 
confrontation, and (5) the length of time between the crime and the 
confrontation.  Biggers, 409 U.S. at 199, 93 S. Ct. at 382.
9.  Lieutenant Wallace testified as to what he told K.K. 
before she viewed the photo spread:
I told her something to the effect of we’re interested 
in the male subject that showed up at the house that day asking for [W.K.]  
I’m going to show you a group of photographs where six males are listed.  
If you see the male subject that showed up at the house, we need you to point 
him out if you’re absolutely sure, but do not identify anybody unless you’re 
100 percent positively sure that that is the person that was here.