# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00378-CR

**Floyd Reed, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT NO. D-1-DC-06-904038, HONORABLE JON N. WISSER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Floyd Reed of aggravated robbery, a first-degree felony requiring a deadly weapon finding. *See* Tex. Penal Code Ann. § 29.03 (West 2007). The trial court found three enhancement allegations true and assessed punishment at twenty-five years' imprisonment. Appellant appeals the trial court's judgment, arguing that the evidence is factually and legally insufficient to support his conviction and that the trial court erred in admitting in-court identifications of him made by eyewitnesses to the crime. We affirm the trial court's judgment.

## BACKGROUND

The evidence at trial showed that at approximately 1:00 pm on January 13, 2005, a man walked into Bank of America on Airport Boulevard in Austin wearing a pair of sheer pantyhose over his face, a beanie hat on his head, and a tan jacket. After entering the bank, he pushed aside a customer standing at the counter and approached one of the bank's tellers, Ana Ceballos. Three bank

customers testified that the man had his arms crossed over his chest and held a gun in his right hand. One of the bank customers specifically testified that the man held the gun under his left elbow. The man stood about two or three feet from Ceballos in front of her station and said, "You know what this is. You know what's going on. Put your hundreds and fifties in the bag. Nothing else. No funny stuff. No dye packs or anything." He then handed her what appeared to be a pillowcase, and she followed his instructions, taking the hundred- and fifty-dollar bills from her drawer and putting them into the pillowcase. He then instructed her to give him her twenty-dollar bills, and she complied, placing the bills and a "rat pack"—a tracking device hidden between two twenty-dollar bills—into the pillowcase. When she finished emptying her drawer, he instructed her to empty the drawer next to her, which she did, including placing a second rat pack into the pillowcase along with the money.

Ceballos did not see a gun in the man's hand, but she testified that "he made [her] believe" he had a gun and that she followed his instructions carefully because she was afraid he would use a gun if he had it. During the robbery, the bank teller to Ceballos's left observed the man from the front but did not see a gun. The bank teller to the right of Ceballos, who was on the phone at the time of the robbery, also observed the man from the front and did not see a gun.

When Ceballos finished emptying the second drawer, she handed the pillowcase back to the man, and he turned and walked out of the bank. As soon as he was gone, she triggered an alarm located under the drawer of another bank teller. Meanwhile, one of the bank customers, Darren Newby, had already left the bank and called 9-1-1 at a nearby Walgreens as soon as he realized a robbery was taking place. In his call to police, he described the robber as a black man, a

2

description that conflicted with those given by the other eyewitnesses at trial. Ceballos and the two other bank tellers testified that the robber was white, one of the bank customers testified the robber was either a white or light-skinned Hispanic man, and another bank customer testified that she could not identify the robber's race but observed he was light-skinned. At trial, Newby explained that he had been standing in line at the bank when he first noticed the man at the counter in front of him and that he had therefore viewed the man only from the back and right side. From where he was standing, he thought the robber was a light-complexioned black man.

Within minutes of the robbery, the rat packs hidden in the stolen money began emitting signals to law enforcement officers. Patrol Officer Tony Thornton received signals from the rat packs, which were transmitted to a special receiver he had on the dashboard of his patrol car. He also received a call over his radio about the robbery that, based on Newby's description, characterized the suspect as a black male. The signals on his dashboard receiver led him to a laundromat located about 175 to 200 yards from the bank. When he saw Newby walking in the parking lot in front of the laundromat, he took Newby into custody because Newby, a black man, matched the general description of the suspect. Thornton did not find either of the rat packs in Newby's possession. Newby was angry at being taken into custody and informed Thornton that he was the person who called 9-1-1 to report the robbery. Nevertheless, Thornton handcuffed Newby and put him into a patrol car until he could confirm his story. Meanwhile, another patrol officer had also followed the signals on his dashboard receiver and entered the laundromat with a hand-held receiver to search for the rat packs. He noticed a white man standing near the front door but paid

3

no attention because he was still under the impression that the suspect was black. In his search of the laundromat, he found a rat pack in one of the trash cans.

John Gomez, who was assisting his wife in running the laundromat on the day of the robbery, testified that a man who he identified at trial as appellant entered the laundromat looking "lost or nervous." Gomez noticed appellant moving back and forth and looking out the side door of the laundromat. When Gomez asked if he could help appellant, appellant asked if Gomez would call him a cab. Gomez agreed to do so and asked a friend to bring him a nearby cordless phone. By the time the friend returned with the phone, appellant had changed his mind and asked if Gomez could take him to McDonalds, which was across the street. Gomez agreed, and appellant then asked if he could use the bathroom. Gomez directed him to the bathroom, where appellant remained for a few moments. By the time appellant came out of the bathroom, Gomez and others in the laundromat had noticed a commotion and several police cars outside in the parking lot. Gomez saw a black man being taken into custody and testified at trial that the man had not been in the laundromat. Gomez saw appellant look out the front windows for a few minutes while the man outside was being taken into custody and then walk out the front door.

By that time, Thornton was in his patrol car with Newby, and his dashboard receiver was still issuing a signal from at least one of the rat packs. He also received a radio communication correcting the description of the suspect, stating that the suspect was a white male, not a black male. Thornton noticed that the signal on his dashboard became stronger when a white male who he identified at trial as appellant walked out of the laundromat. He observed that appellant was wearing a light brown jacket and holding a plastic bag in his hand. When appellant walked past the car, the

4

arrow on Thornton's dashboard receiver followed him. At this, Thornton immediately got out of his car and approached appellant, calling out to him. When appellant spun around, his jacket opened, and Thornton saw a gun inside. He grabbed the gun and took appellant into custody. At the time the gun was recovered, it was found to be a BB gun that was not loaded and did not contain a carbon-dioxide cartridge, which is used to propel the projectiles from the gun.

Detective Brian Miller arrived at the scene after appellant was in custody. He searched the plastic bag carried by appellant and found the second rat pack, which he deactivated. He also found a pillowcase containing $6,441 in cash. Counting the four twenty-dollar bills in the two rat packs, the total amount of money recovered was $6,521, the same amount stolen in the robbery.

After appellant was taken into custody, officers took him and Newby to the bank to determine whether the eyewitnesses could identify either of them. The three bank tellers who saw the robber identified appellant as the man who robbed the bank. At trial, two of the three bank tellers again identified appellant as the robber.[1]

**STANDARDS OF REVIEW**

In determining the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). When faced with conflicting evidence, we presume the

---

[1] Although the third bank teller testified that she identified appellant on the day of the robbery, the prosecutor never asked her to make an in-court identification of appellant.

5

trier of fact resolved conflicts in favor of the verdict. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).

In reviewing factual sufficiency, we must weigh all the evidence in a neutral light and set the finding aside only if the evidence is so weak that the verdict seems clearly wrong or manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). An appellate court must be appropriately deferential to the jury's verdict in order to avoid substituting its own judgment for that of the factfinder. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

In determining the admissibility of an in-court identification when a defendant claims that the pretrial identification procedure was impermissibly suggestive in violation of his due process rights, we must apply the *Guzman* standard. *See Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). Whether a pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Loserth*, 963 S.W.2d at 772-73. Accordingly, we will apply a de novo standard. *Id.* at 773.

**DISCUSSION**

*Sufficiency of Evidence for "Deadly Weapon" Finding*

In his first issue, appellant challenges the legal and factual sufficiency of the evidence that the BB gun he was carrying during the robbery was a "deadly weapon." *See* Tex. Penal Code

6

Ann. § 29.03(a)(2). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See id*. § 1.07(a)(17)(B) (West 2007). Appellant contends that there was insufficient evidence to prove that the BB gun was capable of causing death or serious bodily injury because the gun was not loaded and required a tool to load it, and he did not point it at anyone, use it to hit anyone, or threaten to use it in any way. We disagree with his contention.

First, the court of criminal appeals has concluded that the issue of whether a BB gun was loaded is not significant in our analysis. *See Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002). What is significant is that the BB gun was capable of causing serious bodily injury. *Id*. With testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding. *Id*. Here, a firearms expert, Greg Karim, testified that the BB gun recovered from appellant was ready to fire and capable of causing serious bodily injury or death if it was loaded and contained a carbon-dioxide cartridge. Karim also read to the jury a warning label on the gun stating that "misuse or carelessness may cause serious injury or death." Although the gun was not loaded and did not contain a carbon-dioxide cartridge at the time it was recovered, the evidence at trial showed a gap in time between the robbery and appellant's capture in which appellant would have had an opportunity to dispose of the pellets and cartridge. In fact, the evidence showed that appellant did dispose of one of the rat packs in a trash can in the nearby laundromat during the time between the robbery and his capture. Appellant also argues that Karim's testimony that a tool was required to load the gun, combined with the fact that a tool was not recovered from appellant when he was arrested, shows that the gun was not capable of causing death or serious bodily injury during the robbery. However, Karim's testimony that the gun showed evidence of a

7

tool already having been used to load it supports an inference that appellant used a tool to load the gun before the robbery. Further, as previously stated, the gap in time between the robbery and appellant's capture not only provided appellant the opportunity to dispose of one of the rat packs, which he did, but it also provided an opportunity for him to dispose of numerous other items, including a tool. There is also the possibility that he used a tool to load the gun before he left his home and never brought the tool with him to the robbery.

Second, during the robbery, appellant held the gun in such a way as to display it to three bank customers. It is reasonable for a jury to infer that defendants use loaded guns to facilitate bank robberies. *See id*. Third, although appellant did not point the gun at anyone or threaten anyone with it, the mere carrying of the gun during a bank robbery was legally sufficient evidence for a factfinder to conclude that appellant intended to use the gun as a weapon capable of causing death or serious bodily injury. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000) (holding evidence legally sufficient for deadly weapon finding where victim saw knife sticking out of defendant's back pocket during attack but defendant never touched, brandished, referred to, or overtly displayed knife).

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's deadly weapon finding. Viewing the evidence in a neutral light, we also conclude that the evidence is factually sufficient to support the jury's deadly weapon finding. Accordingly, we overrule appellant's first issue.

### *Sufficiency of Evidence for "Used or Exhibited" Finding*

In his second issue, appellant contends that the evidence at trial was legally and factually insufficient to prove that he "used or exhibited" the gun. *See* Tex. Penal Code

8

Ann. § 29.03(a)(2). In support of his contention, he argues that he did not use or exhibit the gun because he did not fire, brandish, or refer to it in any way. However, the word "used" refers not only to the wielding of a firearm with effect, but it also extends to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony. *See Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989). A jury could reasonably infer that appellant's simple possession of the gun in such a way as to display it to three bank customers showed that appellant both exhibited the gun and used it to facilitate the bank robbery by instilling apprehension in the customers around him, reducing the likelihood of resistance during the encounter. *See McCain*, 22 S.W.3d at 503 (partial exposure of knife in back pocket of defendant during attack sufficient to show knife "exhibited" and "used"); *Patterson*, 769 S.W.2d at 941-42 (gun next to defendant on couch during execution of search warrant sufficient to show defendant "used" gun to facilitate protection of contraband). Further, the verb "use" is defined as "to put into action or service: have recourse to or enjoyment of: employ. . . to carry out a purpose or action by means of: make instrumental to an end or process: apply to advantage: turn to account: utilize." *Patterson*, 769 S.W.2d at 941 (citing Webster's Third New International Dictionary 2523-24 (1976)). Here, a jury could reasonably infer that appellant held the gun in his hand during the robbery so as to "have recourse to" it if the need arose. Viewing the evidence in the light most favorable to the verdict and in a neutral light, we conclude that the evidence is legally and factually sufficient to support the jury's finding that appellant "used or exhibited" the gun during the robbery. Thus, we overrule appellant's second issue.

*Admissibility of In-Court Identifications*

In his final issue, appellant argues that the trial court erred in admitting in-court identifications of him by two of the bank tellers because the pretrial identification procedure—a one-man show-up—was impermissibly suggestive. A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988); *Brown v. State*, 64 S.W.3d 94, 99 (Tex. App.—Austin 2001, no pet.). To render an identification inadmissible, a defendant must prove by clear and convincing evidence both that (1) the out-of-court identification procedure was impermissibly suggestive, and (2) the impermissibly suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Brown*, 64 S.W.3d at 99. Each case must be considered on its own facts. *Id*. Further, the analysis requires an examination of the totality of the circumstances surrounding the identification. *Id*.

The pretrial identification in this case was a one-man show-up. After appellant was arrested, officers took him to the bank. Detective Richard Gujardo was at the bank when officers arrived with appellant. Gujardo testified that he made sure all the witnesses were separated from each other and knew they should not talk to each other. When officers brought appellant, who was handcuffed, to the front of the parking lot, Gujardo took each witness separately to view appellant and determine whether they thought he was the man who robbed the bank. Gujardo testified that appellant was about fifteen to eighteen feet away from the witnesses during the identifications. He also testified that he told each of the witnesses that the man in front of them may or may not be the person who robbed the bank. He instructed them that if they did not recognize the man, they should

10

say so because he did not want to detain a person who had nothing to do with the robbery. Gujardo testified that Newby was also placed alone in front of each of the witnesses separately for identification. The three bank tellers all identified appellant as the man who robbed the bank. One of the bank customers thought appellant looked similar to the bank robber but could not be certain. Another bank customer could neither identify appellant as the robber nor rule him out.

A certain amount of suggestiveness is inherent in any "on the scene" confrontation in the presence of police officers. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967); *Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. 1982) (op. on reh'g). However, evidence of a one-man show-up alone does not violate due process. *See Garza*, 633 S.W.2d at 512. In fact, in many cases, the use of on-the-scene confrontations is necessary. *Id*. Considering the totality of the circumstances surrounding the identification in this case—including that Gujardo separated the witnesses both before and during the identification and instructed them that they were free to identify or not identify the suspect—we do not find that the identification procedure used here involved any more than the inherent suggestiveness associated with a one-man show-up.[2]

Even assuming the identification procedure was impermissibly suggestive, if the overall circumstances reveal no substantial likelihood of misidentification, the identification will be deemed "reliable" and therefore admissible. *Webb*, 760 S.W.2d at 269; *see Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). Reliability is the "linchpin" in determining the

---

[2] Although one of the bank tellers testified that police officers told her before her identification that the suspect was caught with a bag full of money, she corrected herself on redirect examination, stating that the officers never told her about the recovered bag directly but that she overheard the information.

11

admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). In assessing reliability under the totality of the circumstances, we consider the following nonexclusive factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the time between the crime and confrontation. *Ibarra*, 11 S.W.3d at 195; *Webb*, 760 S.W.2d at 269. We view these five factors in the light most favorable to the trial court's ruling. *Loserth*, 963 S.W.2d at 773; *Brown*, 64 S.W.3d at 99. The factors, viewed in this light, should then be weighed de novo against "the corrupting effect" of the suggestive pretrial identification procedure. *Loserth*, 963 S.W.2d at 773-74; *Brown*, 64 S.W.3d at 99.

In considering the first factor, we conclude that both bank tellers who identified appellant at trial had sufficient opportunity to view the robber during the robbery. The man robbing the bank walked up to the station of the first bank teller and stood facing her about two feet away. Although the man wore pantyhose over his face, the bank teller noticed his facial features through the pantyhose, including his nose and eyes. The second bank teller was on the phone when the robber approached the station next to him. The bank teller testified that he was less than four feet from the robber and that the pantyhose over the robber's face were sheer and easy to see through. The bank teller looked at the robber while he was on the phone and continued looking at him after he hung up and until the robber looked back at him.

The second factor is also met. Both bank tellers who identified appellant at trial were more than just casual observers of the robbery and therefore had more reason to be attentive.

12

*See Barley v. State*, 906 S.W.2d 27, 35 (Tex. Crim. App. 1995). The first bank teller was within three feet of the robber, who was ordering her to empty her drawer and the drawer next to hers, and she feared he had a gun. The second bank teller was within four feet of the man and watched as the robbery occurred. Both witnesses had a vested interest in paying careful attention to the robber.

Regarding the third factor, the record is almost silent as to the witnesses' descriptions of the bank robber before they identified appellant in the show-up. The only evidence of a description given to police matching that of appellant is that after Officer Thornton took Newby into custody, he received a radio communication changing the suspect's description from a black male to a white male. Thus, at least one witness from the bank must have described the suspect as a white male before appellant was taken to the bank for identification. The record is also silent as to the fourth factor: the witnesses' degree of certainty during the show-up.

Regarding the fifth factor, the amount of time that passed between the robbery and the confrontation, the record shows that it was somewhere between ten and twenty minutes, an amount of time similar to that deemed acceptable in other cases. *See Hudson v. State*, 675 S.W.2d 507, 510 (Tex. Crim. App. 1984) (less than ten minutes between crime and confrontation); *Garza*, 633 S.W.2d at 513 (less than one-half hour between crime and confrontation); *Powell v. State*, 837 S.W.2d 809, 812 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (no more than ten minutes between crime and confrontation).

Considering the five factors in the light most favorable to the verdict and weighing them against the "corrupting effect" of the suggestive pretrial identification procedure, we conclude

13

that the identification procedure did not give rise to a substantial likelihood of irreparable misidentification.[3] We therefore overrule appellant's third issue.

## CONCLUSION

Because we have concluded that the evidence is legally and factually sufficient to support appellant's conviction and that the trial court did not err in admitting in-court identifications of appellant, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   December 17, 2008

Do Not Publish

---

[3] Appellant also argues that the pretrial identification was tainted because officers did not take written descriptions from the witnesses until after the identification.  However, the written statements are not in evidence, and appellant does not explain how the statements, which occurred after the pretrial identification, are relevant to the conditions present during the robbery and the identification.  Further, he cites no case law in support of his contention.  *See* Tex. R. App. P. 38.1(h).

14