**Affirmed and Opinion filed April 16, 2020.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00403-CR

### KENYA DESHUNE MCGUIRE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1536476**

## OPINION

Appellant Kenya Deshune McGuire appeals his conviction for aggravated robbery with a deadly weapon. *See* Tex. Penal Code Ann. § 29.03(a)(2). In two issues, Appellant contends the trial court erroneously denied his motion to suppress Complainant's pretrial identification and in-trial identification. We affirm.

### BACKGROUND

Complainant lived with his parents and sister in a subdivision in Cypress,

Texas. Since his graduation from high school in 2009, Complainant sold marijuana for a living. He usually sold marijuana from his car to people he knew from high school; he did not sell to strangers.

In the late afternoon on September 23, 2016, Complainant was in his parents' garage waiting for his acquaintance, Damien Washington, to arrive and purchase one pound of marijuana. Complainant met Washington about a year and a half before through a friend and had sold marijuana to him in the past. Complainant was in the garage with two friends when Washington arrived in a white Lexus sports utility vehicle. Washington got out of the car and started walking up the driveway. As Washington was walking, Complainant noticed the passenger door open and a man exiting the car and also walking up the driveway. Complainant did not immediately recognize the man but then remembered seeing him before at the neighborhood corner store.

Because Complainant and Washington agreed that Washington would come alone, Complainant allowed only Washington to enter the garage. Washington and Complainant went to the back of the garage where Complainant had placed the marijuana on top of a desk. While Washington inspected the marijuana, Washington's companion entered the garage. Washington started negotiating the price for the marijuana and the companion walked up closer to look at the marijuana. The companion then reached around Washington, grabbed Washington's pistol from his waistband, pointed the pistol at Complainant, and threatened to kill Complainant. Complainant recognized the pistol as the Smith & Wesson black and silver pistol he had seen in Washington's car. When the companion pulled out Washington's gun, Washington called the companion "Keny" and asked him "What are you doing?"

The companion continued to point the pistol at Complainant and instructed

Washington to "get the weed." Washington grabbed the bag of marijuana from the desk and proceeded to look through all the desk drawers until he found another bag of marijuana. Washington then backed up and went to Complainant's car; he took about $2,000 from Complainant's glove compartment. Meanwhile, Complainant's "sister hear[d] yelling", opened the door from the house to the garage, and asked "What's going on?" The companion pointed the gun at Complainant's sister and she immediately slammed the door shut. The companion then continued to point the pistol at Complainant and threatened to kill him. After Washington took the money from Complainant's car, he and the companion walked backwards out of the garage. The companion continued to point the pistol at Complainant until he and Washington drove away.

After Washington and the companion fled the scene, Complainant's mother called 9-1-1 to report the robbery. Complainant told the operator he knew Washington, provided Washington's full name, and described him as a 35-year-old, 220-pound, 6'2 tall man. Although Complainant did not know the other robber's real name, he told the operator he believed the robber's name was "Keyan" or "Kekan" and described the robber as a light-skinned, bald-headed man with a star tattoo on his neck. Thereafter, the police arrived at Complainant's house, and he "told them what happened."

Harris County Sheriff's Office Deputy Salazar was assigned to investigate the robbery. He arrested Washington on January 4, 2017. Washington told Deputy Salazar that the name of the other robber is "Kenya McGuire." Upon learning this information, Deputy Salazar created a photospread using a photo of Appellant and five other men of the same race and with similar features and hair. He also attempted to match Appellant's neck tattoo.

Complainant was asked to come to the police station to review photospreads

3

on January 5, 2017. Deputy Salazar prepared two folders, each containing a black-and-white and an in-color photospread. The photospreads in folder 1 depicted the same individuals as contained in the photospreads in folder 2, except the individuals were arranged differently. Deputy Salazar provided Complainant with instructions for viewing the photospreads and placed the two folders on the desk. Complainant randomly picked folder 2 and viewed the black-and-white and the in-color photospreads contained therein. Within 10 to 15 seconds of viewing the photospread, Complainant identified Appellant as the individual who had pointed the pistol at him. Complainant circled Appellant's photo and wrote next to it: "Pointed gun at me and sister."

Appellant was indicted for aggravated robbery with a deadly weapon. A jury convicted Appellant of the charged offense and assessed his punishment at 45 years' confinement and a $10,000 fine. Appellant filed a timely appeal.

ANALYSIS

Appellant argues in his first issue that the trial court erroneously denied his motion to suppress Complainant's pretrial identification of him because it was procured by an impermissibly suggestive procedure and "there is a substantial likelihood of misidentification in this case." Appellant argues in his second issue that the trial court erroneously denied his motion to suppress Complainant's in-court identification because it was unreliable.

## I. Standard of Review

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). We afford almost total deference to a trial court's determination of historical facts. *Id*. In a suppression hearing, the trial court is the sole trier of fact and judge of the

4

credibility of the witnesses and the weight to be given their testimony. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Aviles-Barroso v. State*, 477 S.W.3d 363, 380 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). The trial court is entitled to believe or disbelieve all or part of a witness's testimony, even if that testimony is uncontroverted, because the trial court has the opportunity to observe the witness's demeanor and appearance. *Valtierra*, 310 S.W.3d at 447; *Aviles-Barroso*, 477 S.W.3d at 380.

If the trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and determine whether the evidence supports these factual findings. *Valtierra*, 310 S.W.3d at 447; *State v. Smith*, 335 S.W.3d 706, 714 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

We review a trial court's application of the law to the facts *de novo*. *Ruiz*, 577 S.W.3d at 545; *Aviles-Barroso*, 477 S.W.3d at 380; *see also Valtierra*, 310 S.W.3d at 447. We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Ruiz*, 577 S.W.3d at 545; *Adams v. State*, 397 S.W.3d 760, 763 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## II.   Pretrial Identification

We begin by addressing Appellant's contention that the trial court should not have admitted any evidence regarding Complainant's pretrial identification of Appellant because it resulted from an unduly suggestive identification procedure.

"[A] pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). To determine the admissibility of a pretrial identification, we use a

5

two-step analysis asking (1) whether the pretrial procedure was impermissibly suggestive; and (2) if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Tutson v. State*, 530 S.W.3d 322, 326 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972). An analysis under these steps requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Conner*, 67 S.W.3d at 200; *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). A defendant must prove the pretrial identification is unreliable by proving both elements by clear and convincing evidence. *See Fisher v. State*, 525 S.W.3d 759, 762 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

If the indicia of reliability outweigh the influence of an impermissibly suggestive pretrial identification, then the identification testimony is admissible. *Tutson*, 530 S.W.3d at 326-27; *see also Neil*, 409 U.S. at 199. Therefore, even if the pretrial procedure is found to be impermissibly suggestive, identification testimony nevertheless is admissible if the totality of the circumstances shows no substantial likelihood of irreparable misidentification. *See Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999); *Aviles-Barroso*, 477 S.W.3d at 381. If the totality of the circumstances indicates that a substantial likelihood of misidentification exists, then admission of the identification of the defendant amounts to a denial of due process. *Aviles-Barroso*, 477 S.W.3d at 381; *see also Neil*, 409 U.S. at 198-99.

We first consider whether the pretrial photospread identification procedure in this case was impermissibly suggestive. Suggestiveness may result from the manner in which a pretrial identification procedure was conducted; for example, a police officer may point out the suspect or suggest that a suspect is included in the

6

photospread, or the suspect is the only individual closely resembling the pre-procedure description. *Barley*, 906 S.W.2d at 33; *Fisher*, 525 S.W.3d at 762. An identification may be suggestive based on a single procedure or the cumulative effect of multiple procedures and photographs used. *See Barley*, 906 S.W.2d at 33; *Fisher*, 525 S.W.3d at 762.

A photospread is considered unduly suggestive if the individuals featured in the photospread are greatly dissimilar in appearance from the suspect. *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App.—Houston [14th Dist.] 2000, no pet.). A suspect may be greatly dissimilar in appearance because of a distinctly different appearance due to physical characteristics such as race, hair color, height, or age. *Id*. Every photospread must generally contain photographs of individuals who roughly fit the description of the suspect. *Fisher*, 525 S.W.3d at 762-63. While the better practice may be to get as many individuals as possible who fit the defendant's description, neither due process nor common sense requires exactitude. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985).

Here, the trial court held a suppression hearing before allowing Complainant to testify in the jury's presence about his pretrial identification of Appellant or to identify Appellant in court. During the hearing, Complainant identified Appellant as the individual who had pointed a pistol at him during the robbery. Complainant testified he recognized Appellant by his "[f]ace, his tattoos, because I had seen him." Complainant testified he particularly remembered Appellant's eyes "[b]ecause they were looking through me."

Complainant testified he identified Appellant in photospreads at the police station on January 5, 2017. Before Deputy Salazar showed Complainant the black-and-white and color photospreads, Deputy Salazar (1) went over instructions with Complainant; (2) told Complainant that the suspect may or may not be in the

7

photospread; (3) told Complainant he was not obligated to pick someone from the photospread; and (4) did not tell Complainant that Appellant was in the photospread or whom to pick from the photospread. Complainant testified he selected Appellant as the robber from "the memory of September 23, 2016" (less than four months before the identification). Complainant confirmed circling Appellant's photo and writing next to Appellant's photo: "Pointed the gun at me and sister." Complainant also testified he was "certain" that the photo of the person he circled on the photospread was of the individual who had pointed the pistol at him.

Deputy Salazar also testified at the suppression hearing. He stated he developed Appellant as a suspect for the photospreads after interviewing Washington (who provided him with Appellant's information). Deputy Salazar also interviewed Complainant before creating the photospreads. According to Deputy Salazar, Complainant told him the suspect's name was "possibly Kennan" and "he would be able to recognize [the suspect] from a photo lineup possibly from his tattoo."

Deputy Salazar stated he created the photospreads using photos of five individuals of the same race as Appellant who had similar hair styles and facial features. Deputy Salazar testified that he also tried to find individuals with neck tattoos but only one other person (in position number 5) on the photospreads had a neck tattoo. Although Deputy Salazar acknowledged the other person's tattoo was not on the front of the neck and was a different shape, he also stated "[n]ot everybody has the same exact tattoo" and he did not "notate" that Complainant mentioned a star tattoo when he interviewed Complainant.

Deputy Salazar further testified that Complainant looked at the photospreads and identified Appellant as the robber "fairly quickly" within 10 to 15 seconds.

Complainant circled Appellant's photo and noted that Appellant was the one who pointed a gun at Complainant and his sister.

Additionally, before the hearing, the trial court heard Complainant's testimony that he had seen Appellant before the robbery more than once at a neighborhood corner store. Complainant also testified that Washington called Appellant "Kenya" and by his nickname "Keny" during the robbery. According to Complainant, the robbery took place in the afternoon when "[i]t was still daylight" and the garage was open with the lights on. Complainant stated that Appellant pointed a pistol at him for several minutes, and Complainant had an unobstructed view of Appellant's face during the robbery. Complainant also described Appellant as a light-skinned African-American of average height and "thinner than average", with "bald hair" and distinctive neck tattoos. At trial, Complainant could not remember the exact tattoos Appellant had on his neck; he stated the tattoos were a "[p]atch and something on the right side."

Further, the 9-1-1 recording was played in court showing that Complainant not only identified and described Washington as one of the robbers, but also Complainant provided a detailed and accurate description of the man who pointed the pistol at Complainant during the robbery and threatened to kill Complainant.

The trial court denied Appellant's motion to suppress Complainant's pretrial and in-court identification of Appellant, stating as follows:

> Based on the evidence that's been introduced outside the presence of the jury, as well as testimony presented in front of the jury prior to taking up the defendant's motion to suppress outside the presence of the jury, the Court finds that based on the totality of the circumstances that [Complainant] had an opportunity to view the persons who committed this offense at the time of the crime, his testimony — first of all, his testimony was one of the perpetrators of this offense was somebody he was familiar and he knew by name and

sight.

The other individual, he testified, that at least for two minutes the individual was standing in front of him with a gun pointed at him. He also testified that there were lights in the garage as well — as well as it was daytime. He was able to tell the jury that he, at the time of the offense, had an opportunity to view the defendant at the time of the crime.

As far as his attention, his degree of attention, he was able to give a description as reflected in State's Exhibit 5, the 9-1-1 call, to give the physical description. One of the items that he describes in his identification on the 9-1-1 call is a tattoo on the neck, a star tattoo on the neck, which would indicate that there was a degree of attention to the person who committed this offense in his mind at the time that the offense was occurring.

The Court has also considered the description itself . . . that the complainant . . . gave to the 9-1-1 operator at the time of the offense and the accuracy of that description as it relates to the physical appearance of . . . the defendant, when he describes him as bald with a tattoo. And I think on the recording it says a star tattoo and a light complected African-American black male.

The level of certainty demonstrated by [Complainant] when asked by the State how certain he was of his identification, he said he was certain. And as I said, the length of time . . . there was testimony in front of the jury that he had at least a couple minutes to view the person who was holding the gun and he has identified the defendant as the person holding the gun.

The testimony has been that this offense occurred on September 23rd, 201[6], and the . . . photospreads that were shown to [Complainant] that bear his initials is dated January 5th, 2017. And the Court — that is also a factor in the Court's consideration of the ruling on this matter from September to January, just a few months.

The Court will also note for the record that . . . State's Exhibit 8, which is black-and-white. It appears, at least from the Court's view of State's Exhibit 8, you can't tell whether anyone has a tattoo. They're all dark around the neck area.

On State's Exhibit 7, which Deputy Salazar testified was the first photospread that [Complainant] viewed, while there does appear

10

to be a dark mark on the neck of the defendant, which — and for the record, the defendant is in Position 2 on State's Exhibit 7. It does not appear from this exhibit that you can tell which shape that tattoo is.

The Court will also note that in viewing State's Exhibit 7, it appears it be a dark mark on the defendant's neck, on the front of his neck, as depicted in the photograph in Position 2. But it also appears to be a darkness in the front — excuse me — on the front of the neck for the person depicted in Position 4, somewhat the same in Position 5, and somewhat the same in Position 3.

So the Court does not find that the out-of-court identification was impermissibly suggestive, and that the witness has testified that his identification was based on seeing the defendant on that date. Also, the Court has considered the fact that [Complainant] testified that he had seen the defendant on at least one prior occasion at a store in the neighborhood.

So the Court does not find that the out-of-court identification was impermissibly suggestive. So the Court will deny the defendant's motion to suppress the out-of-court identification on State's Exhibit 7 and 8 based on . . . [Complainant's] testimony in court today. The Court will also deny the motion to suppress the in-court identification for the reasons and the factors that the Court has laid out for the record.

The record supports the trial court's finding that the pretrial identification procedure was not impermissibly suggestive. The photospreads contain headshots of Appellant and five other African-American men. The men seem to be of similar age and complexion and have comparable hairstyles. Appellant and three of the men have facial hair while two seem to be shaven. One man is wearing a white t-shirt and the other five are wearing dark t-shirts. On the black-and-white photospread, the neck area of all six men is quite obscured; Appellant's and three of the other men's necks appear very dark and barely visible. It is impossible to see whether any of the individuals featured in the black-and-white photospread has a tattoo.

On the color photospread, each one of the men's front neck area is at least

11

partially obscured by a dark shadow, making it very difficult to see if any of the men have neck tattoos. There seem to be some subtle markings on Appellant's neck. However, as the trial court correctly stated, the shape of Appellant's tattoo is indiscernible and there is a dark mark on the front of Appellant's neck as well as "a darkness . . . on the front of the neck for the person depicted in Position 4, somewhat the same in Position 5, and somewhat the same in Position 3." Additionally, the man in position 5 also has a neck tattoo whose shape is not discernible. Furthermore, Deputy Salazar testified he did not notate that Complainant mentioned a star tattoo when he interviewed Complainant during the investigation.

The five other men depicted on the photospreads resemble Appellant; and even though none of the five men has a star tattoo on the front of the neck, this difference does not render the photospreads impermissibly suggestive. *See Buxton*, 699 S.W.2d at 216 (finding it is not essential that all individuals in a photospread favor the suspect with a high level of exactitude); *Fisher*, 525 S.W.3d at 762-63 ("Every photo array must generally contain photographs of individuals who roughly fit the description of the suspect."); *see also Escovedo v. State*, 902 S.W.2d 109, 117 (Tex. App.—Houston [1st Dist.] 1995, no pet.) (rejecting argument that identification procedure was impermissibly suggestive because no one else in photospread had same amount of facial hair and only one other person had facial tattoo of tear drop).

Based on the record before us and considering the totality of the circumstances, we conclude the pretrial identification procedure was not impermissibly suggestive. Even if Appellant had proven by clear and convincing evidence that the pretrial identification procedure was unduly suggestive, we cannot conclude that it gave rise to a substantial likelihood of irreparable

misidentification so as to make the identification testimony inadmissible.

In determining whether an impermissibly suggestive identification procedure gave rise to a very substantial likelihood of irreparable misidentification, we weigh the following factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the witness's level of certainty regarding the identification; and (5) the length of time between the crime and the identification. *See Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016). Because these factors are issues of historical fact, we weigh them deferentially in a light favorable to the trial court's ruling. *Aviles-Barroso*, 477 S.W.3d at 385; *see Ibarra*, 11 S.W.3d at 195-96. We then weigh the factors, viewed in this light, *de novo* against the "corrupting effect" of the allegedly suggestive pretrial identification procedure. *See Ibarra*, 11 S.W.3d at 195-96.

On this record, all five factors support the reliability of Complainant's pretrial identification.

With respect to the first factor, Complainant testified he had an unobstructed view of Appellant's face during the robbery and Appellant pointed the pistol at him for a few minutes. Appellant was only two to three yards from Complainant when he pointed the pistol at Complainant. It was daylight and the lights were on in the garage. Further, Complainant testified he recognized Appellant during the robbery because he had seen him before at the neighborhood corner store. Complainant's opportunity to view Appellant from a close distance, in good lighting conditions, for a few minutes without any obstruction weighs in favor of the reliability of his identification. *See Tutson*, 530 S.W.3d at 327; *Fisher*, 525 S.W.3d at 764.

Regarding the second factor, Complainant was likely very attentive because "[w]itnesses who are victims, rather than casual observers, are generally believed

to have a greater degree of attention." *Brown v. State*, 64 S.W.3d 94, 101 (Tex. App.—Austin 2001, no pet.). Moreover, Complainant gave a detailed description of the perpetrator to the 9-1-1 operator and even remembered the shape and location of the man's tattoo, suggesting a high degree of attention. Further, Complainant was attentive enough to recognize Appellant as someone he had seen before at the corner store.

Considering the third factor, Complainant accurately described the man who threatened him with a pistol to the 9-1-1 operator as a light-skinned, bald-headed African-American man with a star tattoo on his neck. Appellant does not dispute that Complainant's description of him was accurate. The accuracy of Complainant's prior description of the perpetrator weighs in favor of the reliability of his later identification of Appellant.

As to the fourth factor, Complainant testified he was "certain" Appellant was the man who pointed the pistol at him during the robbery and threatened multiple times to kill him. When Complainant was asked how he knew Appellant was "the male that was in your garage that day", Complainant responded: "Face, his tattoos, because I had seen him." Complainant also testified he remembered Appellant's eyes because "they were looking through me. They were looking at me." Additionally, Deputy Salazar testified that Complainant identified Appellant as the robber on the photospreads "fairly quick" within 10 to 15 seconds. This factor weighs in favor of the reliability of the identification. *See Fisher*, 525 S.W.3d at 764; *Brown*, 64 S.W.3d at 101.

With regard to the fifth factor, only three and a half months passed between the robbery and the pretrial identification. This passage of time is not a long delay between the event and the identification; so, this factor does not weigh against the reliability of Complainant's pretrial identification. *See Delk v. State*, 855 S.W.2d

14

700, 707 (Tex. Crim. App. 1993) (finding 18-month delay between crime and identification did not detract from reliability); *Brown*, 64 S.W.3d at 101 (finding eight-month delay between crime and identification did not detract from reliability).

Appellant did not establish by clear and convincing evidence that Complainant's pretrial identification of Appellant was inadmissible. Accordingly, the trial court did not err in denying Appellant's motion to suppress evidence regarding Complainant's pretrial identification. We overrule Appellant's first issue.

## II. In-Trial Identification

We now turn to Appellant's argument that the trial court reversibly erred by denying his motion to suppress Complainant's in-court identification of Appellant as the person who perpetrated the robbery. Appellant contends Complainant's in-court identification was irreparably tainted by the allegedly impermissibly suggestive pretrial identification procedure. In making this argument Appellant relies on the facts and procedures discussed above.

"An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification." *Ibarra*, 11 S.W.3d at 195. This analysis assesses the reliability of Complainant's in-court identification using the five-factor test applied above. *See Brown*, 29 S.W.3d at 253-54. Even where the pretrial identification procedure is impermissibly suggestive, "in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court identification." *Jackson v. State*, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983). "The defendant has the burden to show by clear and convincing evidence that the

in-court identification is unreliable." *Brown*, 29 S.W.3d at 254.

Our analysis of the first four factors remains the same as above: Complainant had a direct view of Appellant for several minutes from a fairly close distance during daylight. Complainant was likely very attentive and provided a very detailed description of Appellant, including the shape and location of his tattoo; Complainant even recognized Appellant as someone he had seen before at the neighborhood corner store. Complainant's description of the perpetrator matched Appellant. Complainant unequivocally identified Appellant as the man who pointed the pistol at him during the robbery.

Regarding the fifth factor, we conclude that although approximately 19 months elapsed between the robbery and Complainant's in-court identification, this length of time does not counsel against the admission of Complainant's in-court identification. *See Delk*, 855 S.W.2d at 707 (finding 18-month delay between crime and identification did not detract from reliability); *Thomas v. State*, 470 S.W.3d 577, 591-92 (Tex. App.—Houston [1st Dist.] 2015), *aff'd*, 505 S.W.3d 916 (Tex. Crim. App. 2016) (admitting complainant's in-court identification even though it occurred nearly four-and-a-half years after the crime); *Hamilton v. State*, 300 S.W.3d 14, 19 (Tex. App.—San Antonio 2009, pet. ref'd) (admitting complainant's in-court identification even though it occurred over two years after the crime).

Considering the totality of the circumstances, we conclude the identification procedure that preceded Complainant's in-court identification did not give rise to a substantial likelihood of misidentification. Accordingly, the trial court did not abuse its discretion in denying Appellant's motion to suppress Complainant's in-court identification. We overrule Appellant's second issue.

**CONCLUSION**

We affirm the trial court's judgment.

/s/    Meagan Hassan
          Justice

Panel consists of Chief Justice Frost and Justices Wise and Hassan.
Publish — Tex. R. App. P. 47.2(b).