

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00031-CR
_____

NIKITA WEST, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 50724-A

_____

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Nikita West was convicted of aggravated robbery with a deadly weapon, enhanced by one prior conviction, and was sentenced to forty-eight years' incarceration. Although we modify the judgment to reflect that West was convicted of the first-degree-felony offense of aggravated robbery, we conclude that (1) the trial court did not err in admitting buccal swabs into evidence and, (2) even assuming admission of the photographic lineup was error, the record does not reflect a substantial likelihood of misidentification. We, therefore, affirm the trial court's judgment, as modified.

Moniqua Oliver was working as the manager of the Cash Store in September 2015 when a man dressed as a woman entered the store carrying a large silver handgun. The man, clad in women's slacks, blouse, scarf, and sandals, seated himself at a table across the counter from Oliver, who was speaking to a customer. Oliver informed the man that the customer was filling out paperwork and that she could assist him. The man replied that he would wait. A few minutes later, the robber "slid across the desk," pushed Oliver and the customer to the ground, held them at gunpoint, and announced that he was robbing the store. Based on the man's demeanor, Oliver believed the man was dressed like a woman to disguise himself. The man pointed the gun at Oliver and dragged her by the hair to a different desk to retrieve cash from the drawer. He then forced Oliver to the front of the store to retrieve cash from a second drawer and, finally, dragged her to the back of the store, where she retrieved cash from the safe. The man warned Oliver not to trigger any alert to the police, and he removed the mag lock and the panic alarm from Oliver's neck. He then put Oliver and the customer in the bathroom and told them

2

not to come out. In addition to approximately $7,000.00 in cash, the man took Oliver's purse and cell phone. When interviewed two hours after the robbery, Oliver stated that the robber was forty or fifty years old, was freshly shaven, and had a dark complexion. He was wearing a black wig, a black and white shirt, black pants, a pink scarf around his neck, and flip flops.

At trial, Oliver identified West—the man "diagonal from [her] with the turquoise face mask"—as the man who robbed the Cash Store. After the trial court asked West to lower his mask, Oliver again identified him as the assailant.

*(1)*     *No Error in Admission of Buccal Swabs*

Detective Kirby DeLoach of the Longview Police Department (LPD) investigated the Cash Store robbery. DeLoach testified that the suspect left at the Cash Store a piece of paper that was swabbed for DNA. He submitted the swab to the Texas Department of Public Safety (DPS) laboratory and later received a "CODIS hit letter" identifying a person believed to match the profile from the submitted DNA sample. The trial court sustained West's objection to testimony regarding the identity of the person believed to match the submitted DNA profile.

West later signed a voluntary DNA request form authorizing the LPD to collect DNA samples from him. In accordance with West's authorization, Detective Rebecca Reeves collected the DNA samples from West.[1] She gave the DNA samples to DeLoach, who then submitted them to the DPS.[2]

---

[1]Nikita West, Jr., West's son, voluntarily provided a sample of his DNA to the LPD as well. Reeves also submitted Nikita West, Jr.'s, DNA sample to the DPS.

[2]Voluntary DNA sample request forms are proprietary to the LPD and have been in use since 2015.

According to DeLoach, West's voluntary DNA samples were taken via buccal swabs. The swabs, purchased from MedTech Pharmaceutical, arrived at the DPS in boxed, sealed envelopes. In accordance with general procedure, Reeves collected two buccal swabs from West, one from each side of the mouth. After the samples were taken, the swabs were re-packaged and sealed. Reeves recorded the following information on the outside of each sealed package: the collection date and time, the name of the individual from whom the DNA samples were taken, and whether that sample was taken from the left or right side of the mouth. In accordance with procedure, an evidence tracking number—TYL-1510-07224—was assigned to the case and was included on all DNA evidence submitted by the LPD to the DPS. DeLoach knew that the DNA samples submitted to the DPS belonged to West because that was the information Reeves provided to him. DeLoach identified State's Exhibit 7 as the envelopes Reeves gave him after she collected the buccal swabs. The evidence tracking number assigned to this case was consistent with the number on the envelopes and was signed by Reeves and DeLoach.

In the first of two appellate issues, West contends that the trial court erred by "permitting the introduction of evidence of the buccal swab" because the "State had not established the first link in the chain of custody."

"A trial judge has great discretion in the admission of evidence at trial." *Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007). "We review a trial court's decision to admit evidence for an abuse of discretion." *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019); *see Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court "abuses

4

its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).

The Texas Court of Criminal Appeals has explained that, "although the evidentiary rules do not specifically address proper chain of custody, they do state that identification for admissibility purposes is satisfied if the evidence is sufficient to support a finding that the matter in question is what its proponent claims. *Druery*, 225 S.W.3d at 503–04 (citing TEX. R. EVID. 901(a); *Kingsbury v. State*, 14 S.W.3d 405, 407–08 (Tex. App.—Waco 2000, no pet.)). "Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Absent evidence of tampering or other fraud, . . . problems in the chain of custody do not affect the admissibility of the evidence. Instead, such problems affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties." *Druery*, 225 S.W.3d at 503–04.

West claims that the buccal swabs were not properly authenticated because the State failed to show the beginning of the chain of custody. *See Hartsfield v. State*, 200 S.W.3d 813, 818 (Tex. App.—Texarkana 2006, pet. ref'd) (item lacking distinctive features must be authenticated by showing the chain of custody "typically from the scene of the crime to the courtroom"); *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("The authentication requirement for admissibility is met once the State has shown the

beginning and the end of the chain of custody, particularly when the chain ends at a laboratory.").

The evidence established that Reeves collected the DNA samples from West after he signed a voluntary DNA sample consent form that included his date of birth, his address, his telephone number, and his driver's license number. When DeLoach fingerprinted West, West gave DeLoach his date of birth, and that date matched the date on the voluntary DNA request form. DeLoach testified that Reeves delivered the buccal swabs to him in envelopes containing her signature and that he submitted the envelopes to the DPS. DeLoach also detailed the procedures used by the LPD to implement a proper chain of custody for such evidence. He described the process by which the DNA evidence was gathered, the way the evidence was sealed in envelopes marked with the collection date and time, the name of the individual from whom the DNA samples were taken, and whether that particular sample was taken from the left or right side of the mouth on the outside of the sealed package. DeLoach testified that a specific evidence tracking number—TYL-1510-07224—was assigned to this case and that all DNA evidence submitted to the DPS, including the envelopes containing West's buccal swabs, included that tracking number. The DNA laboratory reports admitted into evidence in this case likewise contained the assigned evidence tracking number.

Even though Reeves—who collected the DNA samples from West—did not testify at trial, we believe the foregoing evidence is sufficient to support a finding that the buccal swabs in question were taken from West.[3] *See Tienda*, 358 S.W.3d at 638; *Druery*, 225 S.W.3d at 503–

---

[3]The better practice would have been for Reeves to have personally identified the exhibit.

6

04; *Page v. State*, No. 03-03-00444-CR, 2004 WL 2007913, at *2 (Tex. App.—Austin Sept. 10, 2004, no pet.) (mem. op., not designated for publication)[4] (holding that officer's name and suspect's name and case number on evidence envelope along with other testimony establishing that officer had dropped evidence envelope into evidence drop box were sufficient to authenticate exhibit and warrant its admission at trial, even though officer who collected evidence did not personally identify evidence tag); *Kingsbury*, 14 S.W.3d at 407–08. We overrule this point of error.[5]

*(2)*     *Even Assuming Admission of the Photographic Lineup Was Error, the Record Does Not Reflect a Substantial Likelihood of Misidentification*

During her testimony, the State asked Oliver if police investigators showed her a photographic lineup. West objected to the admission of the photographic lineup on the basis that the State failed to establish that it was conducted in accordance with Article 38.20 of the Texas

---

[4]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

[5]To the extent West claims that Reeves's failure to testify violated his Confrontation Clause rights, we find that this issue has been inadequately briefed. The entirety of this argument reads, "In addition to any authentication issue and violation of Rule 901, the state's introduction of evidence without the proper witness denied the Defense the opportunity to cross examine and confront the witness, thus violating Appellant's constitutional rights." "To avoid forfeiting a legal argument for inadequate briefing, an appellant's brief must contain 'a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.'" *Taylor v. State*, 558 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, no pet.) (citing TEX. R. APP. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008)). "Because the Texas Court of Criminal Appeals has emphasized that an appellate court has no obligation to construct and compose issues, facts, and arguments for an appellant, encompassed within Rule 38.1 is the party's task of explaining or discussing why an argument has substance." *Id.* (citing *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017); *Lucio*, 351 S.W.3d at 896–97; *Busby*, 253 S.W.3d at 673). West's brief on the issue of the alleged violation of his Confrontation Clause rights contains no substantive analysis on his general, conclusory complaint. As a result, West has forfeited this issue.

Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.20. The trial court sustained West's initial objection.[6]

The State then called LPD Detective Daniel Lhuillier to testify about the LPD's policy for conducting photographic lineups. According to Lhuillier, two individuals with no knowledge of the suspect typically conduct the lineup. Photographic lineups typically consist of five to seven photographs. Sometimes the witness will mark the back of each photo, rating it one to ten, and sometimes "they just [say] yes or no." LPD Officer Trevor Yates, who also assisted with the investigation of the Cash Store robbery, explained that the LPD photographic lineup policy suggests using a double-blind lineup.

Outside the presence of the jury, the trial court reviewed the recording of the photographic lineup. Afterwards, West again objected to the admission of the photographs used in the lineup, because there was no predicate testimony regarding the LPD's policy on photographic lineups and because the detective administering the lineup commented on the evidence.[7] West further objected on the basis that the men in the photographs looked nothing alike, arguing that the photographs used in the lineup were highly prejudicial. Finally, West

---

[6]Outside the presence of the jury, the State admitted that Oliver was the only witness available to lay the proper predicate for the photographic lineup. West also objected to the introduction of a recording of the photographic lineup identification. That exhibit was admitted for record purposes only and was not published to the jury.

[7]The recording indicates that six photographs were used in the lineup. Oliver selected the third photograph, stating that it was an image of the man who robbed the Cash Store. Oliver stated that she was "almost positive." She explained that she remembered the robber's jawbone and forehead as being the same as the man she selected in the photographic lineup.

Although neither party mentioned it in their briefing to this Court, the photograph used to identify the robber in the recording appears to be different from the photograph Oliver signed indicating that the person pictured was the robber, which photograph was introduced as a part of State's Exhibit 4 at trial.

objected on the basis that the detective encouraged Oliver to be certain of the identification because the statute of limitations was about to run on the offense.

The trial court overruled West's objections because it found that the LPD had a policy for conducting photographic lineups that required two individuals with no knowledge of the suspect (double-blind administration) to conduct the lineup. The court further found that, although the LPD slightly deviated from its policy, that consideration did not affect the admissibility of the evidence. The court ultimately concluded that the photographic lineup was not impermissibly suggestive.

The State then recalled Oliver to the witness stand for the purpose of authenticating the photographic lineup. She testified that State's Exhibit 4 was a form that she signed after she reviewed the photographic lineup on April 19, 2019, together with a series of photographs from the lineup.[8] The form read:

> You will be asked to look at a series of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obligated to identify anyone. It is as important to free innocent persons from suspicion, as it is to identify guilty parties. Please do not discuss this case with other witnesses nor indicate in any way that you have identified someone.[9]

In the event the witness identifies a person from the lineup, the form then instructs, "Please write in **YOUR OWN WORDS** how confident you are that the person you selected was involved in this case." Oliver signed the form. Although Oliver signed and dated the first photograph in the

---

[8]West objected to the admission of Exhibit 4 on the basis that it was not properly authenticated. The trial court overruled the objection and admitted the evidence.

[9]The recording of the photographic lineup, which the trial court viewed, shows the officer reading these instructions to Oliver and Oliver indicating that she understands them.

9

series of six, she did not write anything on the form describing her level of confidence that the person she selected was involved in the case. Nevertheless, Oliver testified that she was confident West was the man who robbed the Cash Store.

In his second point of error, West complains that the trial court committed reversible error by permitting the introduction of the photographic lineup because it was impermissibly suggestive as "no other individual in [the] photo lineup appear[ed] to be within 20 years of age of the image of the Defendant" and because, "due to the variety of build, skin tone/complexion and facial hair patterns, the array [was] not substantially similar to that of [the Defendant]."[10]

"Reliability is the linchpin in determining admissibility of identification testimony." *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). "The due process clause of the Fourteenth Amendment prohibits the use of identification testimony from a witness who was subjected to an impermissibly suggestive pretrial identification procedure." *Roberts v. State*, 923 S.W.2d 141, 144 (Tex. App.—Texarkana 1996, pet. ref'd). "The reason for the rule is the substantial likelihood of misidentification that suggestive procedures may engender." *Id.* (citing *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988)). Suggestiveness may be "created by the content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-procedure description." *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (citing *Williams v. State*, 675 S.W.2d 754 (Tex. Crim. App. 1984)).

When challenging the admissibility of a pretrial identification, the defendant has the burden to show, by clear and convincing evidence, that (1) the out-of-court identification

---

[10]On appeal, West does not complain about the manner in which the photographic lineup was administered.

10

procedure was impermissibly suggestive and (2) the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33–34 (citing *Simmons v. United States*, 390 U.S. 377 (1968)); *see Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993). "If the totality of the circumstances indicates a substantial likelihood of irreparable misidentification exists, admission of the identification of the defendant amounts to a denial of due process." *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). Conversely, "if [a photographic lineup] is found to be impermissibly suggestive, identification testimony would nevertheless be admissible where the totality of the circumstances shows no substantial likelihood of misidentification." *Id.* (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)).

West is an African American male. The photographic array contains headshots of West and five other African American males. The photograph Oliver identified as the robber depicts a middle-aged man with no hair, gray and black facial hair, and a dark complexion. The second photograph depicts a younger man with a goatee and partial beard, and a lighter-toned skin. The third photograph depicts a younger man with no hair, a goatee, and a lighter-toned skin. The fourth photograph depicts a younger man with hair, a goatee, and a lighter-toned skin, while the fifth photograph depicts a somewhat younger man with hair, a beard, and a dark complexion. Finally, the sixth photograph depicts a younger man with hair, a goatee, and a lighter-toned skin. The most remarkable differences between the photograph that Oliver identified as depicting the robber and at least four of the remaining photographs is an easily discernable age difference.

11

And, except for one other photograph, the man depicted in the photograph Oliver identified as the robber had a darker complexion than four of the other subjects. As for similarities amongst the photographs, all the subjects depicted were African American, all had some type of facial hair, and none of them had any other unique facial characteristics. Each photograph depicted a headshot with a blue background, and nothing about the way the photographs were taken caused any of them to stand out from the others.

A lineup is considered impermissibly suggestive if other participants are greatly dissimilar in appearance from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (citing *United States v. Wade*, 388 U.S. 218, 232–33 (1967)). For example, "lineup participants appearing to be younger than the appellant" cannot "alone render the . . . lineup procedure impermissibly suggestive." *Williams v. State*, 675 S.W.2d 754, 757 (Tex. Crim. App. 1984) (citing *Turner v. State*, 600 S.W.2d 927 (Tex. Crim. App. 1980)). As for West's accurate observation that some of the photographs depicted individuals with skin tones lighter than his, "it is not essential that all the individuals be identical." *Buxton*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985); *see Clay v. State*, 702 S.W.2d 747, 749 (Tex. App.—San Antonio 1985, pet. ref'd) ("Even if the other photographs portrayed individuals who apparently had different shades of skin color, that would not by itself render the lineup impermissibly suggestive.") (citing *Garcia v. State*, 563 S.W.2d 925 (Tex. Crim. App. 1978)).

On this record, the photographic lineup included participants who not only appeared to be younger than West, all but one of the participants also had a much lighter skin tone. But even

12

assuming that the photographic lineup should not have been admitted, the record does not reflect a substantial likelihood that Oliver misidentified West. In evaluating this likelihood, we may consider these nonexclusive factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation[;] and (5) the length of time between the crime and the confrontation.

*Ibarra*, 11 S.W.3d at 195 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)); *see Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988). We view these factors "deferentially in a light favorable to the trial court's ruling." *Id.*

Even though Oliver did not identify West in the photographic lineup until well after the robbery happened, she expressed a high degree of confidence in her identification of West's photograph, stating that she was "almost positive." She testified again at trial that West was the robber.

Oliver had an ample opportunity to view West even before the robbery happened. She was able to view West from a close vantage point when he sat at a table across from Oliver for "a few minutes" before he accosted her. It appeared that West was acting as a customer at that point, as he told Oliver that he would wait until the customer filling out the paperwork was finished. That provided Oliver with an initial opportunity to observe West before he accosted her, thus decreasing the risk of a tainted identification. *See Stokes v. State*, No. 03-02-00508-CR, 2003 WL 21401267, at *3 (Tex. App.—Austin June 19, 2003, no pet.) (mem. op., not designated for publication). Also, Oliver had reason to focus her utmost attention on West when he slid

across the counter and accosted her. *See Brown v. State*, 64 S.W.3d 94, 101 (Tex. App.—Austin 2001, no pet.) ("Witnesses who are victims, rather than casual observers, are generally believed to have a greater degree of attention."); *Green v. State*, No. 06-15-00232-CR, 2016 WL 7234071, at *3 (Tex. App.—Texarkana Dec. 14, 2016, no pet.) (mem. op., not designated for publication) (same). Oliver had even more opportunities to observe West when he required her to open two cash drawers and a safe before shoving her into the bathroom.

Two hours after the robbery, Oliver was able to describe West in detail by age, skin tone, and attire. And, even several years later, Oliver stated that the robber's jawbone and his forehead were the same as the man identified in the photograph.

In addition to the foregoing nonexclusive factors, the record includes undisputed DNA evidence establishing West as the individual who robbed the Cash Store. Kristen Cossota, a forensic scientist for the DPS criminal laboratory wrote the DNA report in crime laboratory sample number TYL-1510-07224. Cossota's report of June 10, 2020, regarding the DNA extracted from the paper handled by the robber stated:

> The previously obtained partial DNA profile from this item is interpreted as a mixture of two individuals. The probability of obtaining this mixture profile if the DNA came from Nikita West Sr. and one unrelated, unknown individual is 116 quintillion times greater than the probability of obtaining this profile if the DNA came from two unrelated, unknown individuals. This likelihood ratio indicates support for the proposition that Nikita West Sr. is a possible contributor to the profile.

According to Cossota, "this number indicates strong support for [the] hypothesis" that West's DNA was included in the sample taken from the paper.

14

Cassandra Canela, a forensic DNA analyst in the DNA section of the DPS crime laboratory in Garland explained that she issued a DNA report in 2021 comparing Nikita West, Jr.'s, known DNA to submitted evidentiary profiles. Canela concluded that the likelihood ratio of Nikita West, Jr., being a contributor of the DNA on the paper handled by the robber was .0836. That supports an exclusionary hypothesis that the DNA profile did not come from the individual being compared. As a result, Canela's report excluded Nikita West, Jr., as a contributor of the DNA on the paper handled by the robber. Conversely, the likelihood ratio for West being a contributor of the DNA on the paper handled by the robber was 116 quintillion. That likelihood ratio supports inclusion.

Based on this evidence and our evaluation of the nonexclusive *Biggers* factors, we conclude that, even if the trial court erred in admitting the photographic lineup, such admission did not result in a substantial likelihood that Oliver misidentified West. We overrule this point of error.

*(3)* *We Modify the Judgment to Reflect the Correct Offense*

Though we have overruled West's points of error, we find, sua sponte, that the trial court's judgment requires modification. We have the authority to modify the judgment for accuracy, even if a party does not raise the issue. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.— Texarkana 2009, no pet.). "Our authority to reform incorrect judgments is not dependent on the request of any party, nor does it turn on a question of whether a party has or has not objected in

15

trial court; we may act sua sponte and may have a duty to do so." *Rhoten*, 299 S.W.3d at 356; *see French*, 830 S.W.2d at 609.

West was indicted for aggravated robbery, a first-degree felony, *see* TEX. PENAL CODE ANN. § 29.03(b), the trial court instructed the jury on aggravated robbery, and the jury found West guilty of aggravated robbery. Although the judgment of conviction lists the correct statute for the offense of aggravated robbery, the judgment lists the offense for which West was convicted as aggravated assault and lists the degree of offense as a second-degree felony. Because West was tried for and convicted of aggravated robbery, a first-degree felony, we modify the judgment to so reflect. We delete from the judgment "aggravated assault" as the offense for which West was convicted and replace it with "aggravated robbery." Likewise, we delete "2nd Degree Felony" as the degree of offense for which West was convicted and replace it with "First-Degree Felony."

We affirm the trial court's judgment, as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:     October 10, 2022
Date Decided:       November 4, 2022

Do Not Publish

16